## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DONALD FINK,                            )
                                        )
      Plaintiff,                    )
                                        )
  vs.                                 )      Case No. 4:12CV 295 LMB
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
      Defendant.                    )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Donald Fink for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 14).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 20).

## Procedural History

On September 22, 2009, plaintiff filed his application for Disability Insurance Benefits, claiming that he became unable to work due to his disabling condition on May 15, 2006.[1]  (Tr.

---

[1]The ALJ noted that plaintiff implicitly requests reopening of an adverse Title II/Title XVI decision dated March 28, 2008, in that he alleges that same disability onset date.  (Tr. 10).  The ALJ denied plaintiff's request, finding that the record does not show good cause for reopening the previous application.  (Id.).  The ALJ stated that the pre-March 29, 2008 period is barred by the

153).  Plaintiff filed his application for Supplemental Security Income on September 25, 2009, alleging the same onset of disability date.  (Tr. 160).  Plaintiff's claims were denied initially, and following an administrative hearing, plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ), dated February 12, 2011.  (Tr. 56-57, 10-16).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on December 28, 2011.  (Tr. 5, 1-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on September 16, 2010.  (Tr. 19).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Jeffrey F. Magrowski.  (Id.).

The ALJ examined plaintiff, who testified that he was divorced.  (Tr. 22).  Plaintiff stated that he has an eleven-year-old daughter from a different relationship, who lives with her mother. (Id.).  Plaintiff testified that his daughter has a form of autism.  (Id.).  Plaintiff stated that his daughter and her mother live two miles from him, and that he has never lived with his daughter. (Id.).

Plaintiff testified that he drives two miles to his daughter's house to make sure she gets on and off the bus.  (Tr. 23).  Plaintiff stated that his daughter's mother works in the morning.  (Id.).

---

doctrine of res judicata.  Plaintiff does not dispute this finding.  Thus, the medical evidence dated prior to March 29, 2008 will not be reevaluated.  See Bladow v. Apfel, 205 F.3d 356, 361 n. 7 (8th Cir. 2000).

Plaintiff testified that he has a twelfth-grade education.  (Id.).  Plaintiff stated that he did not take any college classes.  (Tr. 24).  Plaintiff testified that he is able to read, write, and perform basic arithmetic.  (Id.).

Plaintiff stated that he has no source of income.  (Id.).  Plaintiff testified that he lives in a house given to him by his father, and his girlfriend pays his electric bill.  (Tr. 25).  Plaintiff stated that he lives alone, but his girlfriend cooks and cleans for him.  (Id.).

Plaintiff testified that he filed a workers' compensation claim in the 1980s for a back injury.  (Id.).  Plaintiff testified that he receives Medicaid benefits.  (Id.).

Plaintiff stated that he last worked in 2006, doing remodeling work for a construction company.  (Id.).  Plaintiff testified that he was a "helper," which involved getting tools together, cleaning up trash, and painting.  (Tr. 26).  Plaintiff stated that he left this position because he was having trouble with his thyroid and was getting slower at work.  (Tr. 27).  Plaintiff testified that, prior to working for the construction company, he was self-employed as a subcontractor for the same construction company.  (Id.).

Plaintiff stated that he previously worked as a manger at a hardware store.   (Tr. 26).  Plaintiff testified that he hired and fired employees, ordered merchandise, assisted customers, and helped his employees.  (Id.).  Plaintiff stated that he was terminated from this position because the store was not profitable.  (Tr. 27).

Plaintiff stated that he worked as an order filler at a grocery warehouse.  (Tr. 26).  Plaintiff testified that he filled orders, and wrapped them at this position.  (Id.).  Plaintiff stated that he drove a forklift.  (Id.).  Plaintiff testified that he left this job when the company closed.

- 3 -

(Tr. 27).

Plaintiff testified that he suffers from severe depression and anxiety.  (Tr. 29).  Plaintiff stated that his depression and anxiety started when he had problems with his thyroid and he was unable to perform his job like he usually did.  (Tr. 29).  Plaintiff testified that these impairments worsened to the point that he was unable to be around people.  (Id.).

Plaintiff stated that he started receiving psychological treatment through Comtrea in 2006 or 2007.  (Id.).  Plaintiff testified that he sees a psychiatrist and a counselor every four to six weeks.  (Tr. 30).  Plaintiff stated that he takes medication, and that his medication is adjusted frequently.  (Id.).  Plaintiff testified that he takes his medication as prescribed.  (Id.).

Plaintiff stated that, due to his anxiety, he does not like being around people or driving a car.  (Id.).  Plaintiff testified that he experiences mood swings.  (Id.).  Plaintiff stated that he goes from being "all right" to being angry.  (Id.).

Plaintiff testified that he lives in a home built by his father along the river.  (Tr. 31).  Plaintiff stated that he no longer has any pets.  (Id.).  Plaintiff testified that he lives alone but he spends a lot of time at the home of his girlfriend and daughter.  (Id.).

Plaintiff stated that he has never smoked cigarettes but he has smoked marijuana in the past.  (Tr. 32).  Plaintiff testified that he used to drink alcohol heavily.  (Id.).  Plaintiff stated that he used other drugs in the 1970s.  (Id.).  Plaintiff testified that he last used marijuana several months prior to the hearing.  (Tr. 33).

Plaintiff testified that he has told his girlfriend that the world would be better off if he were not around.  (Tr. 34).

- 4 -

Plaintiff stated that he stopped taking Cymbalta[2] for a while, but then started taking it again when he realized it was helping.  (Id.).

Plaintiff testified that he only drives to his daughter's home, which is within two miles of his home.  (Id.).

Plaintiff stated that he has not tried to find a job because he is unable to paint, or even perform simple tasks at home.  (Tr. 35).

Plaintiff testified that he receives food stamps.  (Id.).  Plaintiff stated that he cooks microwave meals.  (Id.).

Plaintiff testified that he washes his own dishes, and his girlfriend does his laundry.  (Tr. 36).

Plaintiff's attorney examined plaintiff, who testified that he does not drive often because it bothers him when vehicles are driving too slow, when vehicles get too close to him, or when vehicles are "whizzing around" him on the highway.  (Id.).  Plaintiff stated that his girlfriend does all the highway driving.  (Id.).  Plaintiff testified that he lives in a rural area.  (Id.).

Plaintiff's attorney noted that plaintiff's hands and arms were shaking.  (Id.).  Plaintiff testified that he was nervous due to the hearing, although his hands occasionally shake even when he is not nervous.  (Id.).  Plaintiff stated that he is unable to paint due to the shaking.  (Id.).

Plaintiff testified that he sees nurse practitioner Philip Cummings mostly for his thyroid, although he treats him for back spasms and anxiety as well.  (Tr. 37).  Plaintiff stated that Mr. Cummings adjusts his dosages of medication.  (Id.).

---

[2]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See Physician's Desk Reference ("PDR"), 1801 (63rd Ed. 2009).

Plaintiff testified that he has broken down and cried in Mr. Cummings' office.  (Id.).
Plaintiff stated that he experiences crying spells at home as well.  (Tr. 38).  Plaintiff testified that
he cries once or twice a week.  (Id.).  Plaintiff stated that he cries because he is not the same
person he used to be.  (Id.).  Plaintiff testified that he is no longer strong, and he is unable to help
his girlfriend with repairs to her home.  (Id.).  Plaintiff stated that he also had difficulty helping his
daughter with her homework because he forgets simple things.  (Id.).

Plaintiff testified that he has difficulty sleeping.  (Tr. 39).  Plaintiff stated that he wakes up
frequently due to nightmares.  (Id.).  Plaintiff stated that he has tried different medications for his
sleep problems.  (Id.).  Plaintiff testified that he is very tired during the day, although he is unable
to sleep during the day.  (Tr. 40).  Plaintiff stated that he lies down a couple times during the day
to try to sleep.  (Id.).

Plaintiff testified that he has not used marijuana since his June 2010 hospitalization.  (Tr.
41).  Plaintiff stated that the marijuana helped him sleep a little better.  (Id.).

Plaintiff testified that, if he had a job that involved sitting most of the day, he would have
to get up and move around frequently.  (Id.).  Plaintiff stated that he would feel like he needed a
nap because he does not sleep well at night.  (Id.).  Plaintiff testified that he would have crying
spells at work.  (Id.).  Plaintiff stated that he would also experience anxiety and shake if he were
unable to do something at work.  (Tr. 42).

Plaintiff testified that he stopped taking Cymbalta at one point without consulting his
doctor because he believed he was taking too much medication.  (Id.).  Plaintiff stated that he
started taking it again when he realized that it had been helping with his anger.  (Id.).  Plaintiff
testified that he was taking his medications as prescribed at the time of the hearing.  (Id.).

- 6 -

Plaintiff stated that he generally experiences a lot of anxiety and built up tension from not sleeping well.  (Tr. 43).  Plaintiff testified that he does not feel like hurting himself.  (Id.).

Plaintiff stated that he does not have any friends that he sees.  (Id.).  Plaintiff testified that he is close to one of his brothers and sees him once or twice a month.  (Id.).  Plaintiff testified that he and his brother talk about their thyroid conditions and current events when they visit.  (Id.).  Plaintiff stated that he sees his other brother and sister-in-law about every month or two.  (Id.).

Plaintiff stated that his mental condition has worsened in the last two years.  (Tr. 44).

Plaintiff testified that he worries a lot about side effects from his medications.  (Tr. 45).

Plaintiff stated that he last went out with a friend about one year prior to the hearing.  (Id.).

Plaintiff stated that he experiences back pain from a bulging disc.  (Tr. 46).  Plaintiff testified that he also has back spasms.  (Id.).  Plaintiff stated that his back problems started in the 1990s.  (Id.).  Plaintiff testified that he filed a workers' compensation claim due to his back pain.  (Id.).

Plaintiff stated that his mental impairments are preventing him from working.  (Tr. 47).

The ALJ examined vocational expert Jeffrey F. Magrowski, Ph.D., who testified that plaintiff has not performed any unskilled work in the fifteen years prior to the hearing.  (Tr. 48).  The ALJ asked Dr. Magrowski to assume a hypothetical claimant with plaintiff's background and the following limitations: no exertional limitations; able to understand, remember, and carry out simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is causal and infrequent; and perform repetitive

- 7 -

work according to set procedures, sequence and pace.  (Tr. 49).  Dr. Magrowski testified that the hypothetical claimant would be able to perform many jobs, such as stocker, which is medium and unskilled (200,000 positions nationally, 5,000 positions in Missouri); and hand packager, which is medium and unskilled (300,000 positions nationally, 4,000 positions in Missouri).  (Id.).

The ALJ next asked Dr. Magrowski to assume the same limitations as the previous hypothetical, with the following modification: respond appropriately to supervisors in a task-oriented setting where contact with co-workers and others is casual and infrequent.  (Id.).  Dr. Magrowski testified that the individual would be able to perform the jobs he previously identified. (Tr. 50).

The ALJ asked Dr. Magrowski to assume the same limitations as the second hypothetical, with the following modification: unable to maintain concentration and attention for two-hour segments over an eight-hour period.  (Id.).  Dr. Magrowski testified that such an individual would be unable to perform any full-time work without accommodation.  (Id.).

The ALJ indicated that he would order a psychological evaluation.  (Tr. 51).

**B.    Relevant Medical Records**

Plaintiff presented to Roberta C. Stock, RN, CS, APMHCNS, at Comtrea Community Treatment, Inc. ("Comtrea") on April 14, 2008, for medication management and supportive psychotherapy.  (Tr. 431-32).  Plaintiff reported that his house had recently been flooded.  (Tr. 431).  Plaintiff complained of increased depression, but no overt suicidal or homicidal ideation. (Id.).  Plaintiff stated that it would be "okay to die."  (Id.).  Plaintiff also reported increased anxiety, mood swings of increased anger, and some verbal lashing out.  (Id.).  Plaintiff stated that he hears voices, but could not be descriptive about it.  (Id.).  Upon mental status examination,

plaintiff seemed anxious, agitated, irritable, angry, and depressed.  (Id.).  No overt psychosis was noted, although plaintiff reported hearing voices, seeing shadows, and feeling people talk about him.  (Id.).  Plaintiff was very negative in his thoughts and resistive to any intervention as far as that.  (Id.).  Ms. Stock diagnosed plaintiff with major depression, recurrent; probable bipolar affective disorder[3] with question of psychosis; personality disorder NOS;[4] and a GAF score of 45.[5]  (Id.).  Plaintiff's Wellbutrin,[6] Zoloft,[7] Klonopin,[8] and Trazodone[9] were continued, and he was started on Abilify.[10]  (Tr. 432).

Plaintiff saw Ms. Stock on May 20, 2008, at which time it was noted that plaintiff continued to be noncompliant with medication, stating that he ran out of Abilify for about a week.

_____

[3]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[4]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment affect, impulse control and interpersonal functioning.  Stedman's at 570.

[5]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[6]Wellbutrin is an antidepressant drug indicated for the treatment of major depressive disorder.  See PDR at 1649.

[7]Zoloft is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited March 21, 2013).

[8]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

[9]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited March 21, 2013).

[10]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder and major depressive disorder.  See PDR at 881.

- 9 -

(Tr. 429).  Plaintiff continued to report depression, with no suicidal or homicidal ideations.  (Id.).
Plaintiff reported occasional anxiety.  (Id.).  Plaintiff indicated that his mood swings improved
with the Abilify, but he still heard voices.  (Id.).  Ms. Stock stated that plaintiff was "quite
dependent."  (Id.).  Upon mental status examination, plaintiff was slow in his speech and
movements; his affect was blunted; he seemed depressed; no overt psychosis was noted, but he
spoke of hearing voices and seeing shadows; no anger or irritability was noted; and plaintiff was
negative in his thought process and resistive as far as any intervention related to that.  (Id.).  Ms.
Stock's diagnoses remained unchanged.  (Id.).  Plaintiff's dosage of Abilify was increased.  (Tr.
430).  On June 17, 2008, plaintiff remained depressed and continued to hear voices.  (Tr. 427).
Ms. Stock's diagnoses remained unchanged.  (Id.).  Plaintiff's dosage of Abilify was increased
again.  (Tr. 428).

On July 10, 2008, plaintiff reported that he thinks he may have slightly improved, and that
he had some better days.  (Tr. 425).  Plaintiff continued to experience depression, hear voices, and
have mood swings.  (Id.).  Ms. Stock changed her diagnoses to bipolar affective disorder with
psychotic features; personality disorder NOS; and a GAF score of 45-50.  (Id.).  Plaintiff's
medications were continued.  (Id.).

On August 11, 2008, plaintiff reported that he does not hear voices but he does see smoke
and shadows.  (Tr. 423).  Ms. Stock's diagnoses remained unchanged.  (Id.).  On September 15,
2008, plaintiff had been out of Abilify for a couple of days and reported increased mood swings.
(Tr. 421).  Plaintiff denied any current auditory hallucinations, but reported that he sees shadows
at times.  (Id.).  Ms. Stock's diagnoses remained unchanged.  (Id.).

On October 27, 2008, plaintiff reported that he had been out of Abilify for three or four

- 10 -

days.  (Tr. 419).  Plaintiff reported hearing background noises at times but no command hallucinations or voices that he could understand.  (Id.).  Ms. Stock noted that plaintiff continued to be "quite dependent and passive related to his care."  (Id.).  Ms. Stock's diagnoses were bipolar affective disorder II[11] with psychotic features; personality disorder NOS with passive dependent traits; and a GAF score of 50.  (Id.).

On December 12, 2008, plaintiff again ran out of his Abilify and did not call for any more samples.  (Tr. 417).  Plaintiff reported hearing a television playing in the other room when it is not on, but no other hallucinations.  (Id.).  Ms. Stock advised plaintiff to increase his activity and develop some coping skills for his negative thoughts, but plaintiff was resistive to these suggestions.  (Id.).  Ms. Stock's diagnoses remained unchanged.  (Id.).  Plaintiff was started on Invega[12] instead of Abilify as there were no samples available for Abilify.  (Id.).

On February 6, 2009, plaintiff reported increased mood swings of anger coupled with crying spells without the Abilify.  (Tr. 415).  Plaintiff reported that he still sees some shadows but that is usual for him.  (Id.).

On March 6, 2009, plaintiff was started back on Abilify, as his application for Medicaid benefits had been granted.  (Tr. 413).

On April 22, 2009, plaintiff reported improved mood swings after re-starting the Abilify. (Tr. 412).  Plaintiff denied any psychosis.  (Id.).

Plaintiff presented to Philip Cummings, FNP at Great Mines Health Center on May 5,

---

[11]An affective disorder characterized by the occurrence of alternating, hypomanic and major depressive episodes.  Stedman's at 568.

[12]Invega is an antipsychotic drug indicated for the treatment of schizophrenia.  See PDR at 1748.

2009, at which time he was diagnosed with hypothyroidism[13] and was prescribed Levothyroxine.[14] (Tr. 364).

On June 2, 2009, plaintiff reported that he had not been doing well the past couple of weeks.  (Tr. 410).  Plaintiff indicated that he had been more irritable, more angry, more depressed, and felt that everyone would be better off if he were not living.  (Id.).  Ms. Stock assessed a GAF score of 40,[15] and recommended that plaintiff go to the hospital.  (Id.).

Plaintiff presented to St. Anthony's Medical Center on June 2, 2009, with reports of being suicidal.  (Tr. 337).  Plaintiff was feeling hopeless, helpless, and despondent.  (Id.).  Plaintiff admitted to using alcohol a month ago, using marijuana in the recent past, and not taking his Tegretol.  (Id.).  Plaintiff was admitted for physical examination, laboratory testing, group therapy, milieu therapy, and medication trials.  (Id.).  Plaintiff was discharged on June 8, 2009, with diagnoses of bipolar disorder, substance abuse disorder, noncompliance issues, and issues with social problems.  (Id.).  Plaintiff was prescribed Effexor[16] to help with anxiety, depression, and suicidal thoughts.  (Id.).  It was recommended that plaintiff start a 12-step program to remain sober.  (Id.).

---

[13]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, and somnolence.  Stedman's at 939.

[14]Levothyroxine is indicated for the treatment of hypothyroidism.  See PDR at 2605.

[15]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

[16]Effexor is an antidepressant drug indicated for the treatment of major depressive disorder and generalized anxiety disorder.  (Tr. 3195-96).

Plaintiff saw Ms. Stock on June 17, 2009, at which time plaintiff reported that he had stopped some of the medications that were started during his hospitalization due to side effects. (Tr. 408).  Plaintiff reported that his mood has been fairly stable, he has not had any anger, and he was somewhat depressed.  (Id.).  Ms. Stock diagnosed plaintiff with bipolar affective disorder, type II, with psychotic features; personality disorder, NOS, with dependent traits; and assessed a GAF score of 50.  (Id.).  Plaintiff was started on Cymbalta.  (Tr. 409).

On July 15, 2009, plaintiff reported that he was doing much better on Cymbalta, and that his mood was good.  (Tr. 407).  Plaintiff was pleasant on examination, and had a somewhat blunted affect but did not show depression.  (Id.).  Ms. Stock diagnosed plaintiff with bipolar affective disorder, type II, with psychotic features; personality disorder, NOS, with dependent traits; and assessed a GAF score of 40 to 45.  (Id.).

On August 27, 2009, plaintiff reported that he was doing pretty well.  (Tr. 405).  Plaintiff indicated that he had been slightly more angry and irritable, but was not lashing out in any way, and he reported that his depression was stable.  (Id.).  Ms. Stock diagnosed plaintiff with bipolar affective disorder, type II, with psychotic features; personality disorder, NOS, with dependent traits; and assessed a GAF score of 45 to 50.  (Id.).

On October 8, 2009, plaintiff reported some depression but indicated that his mood has been level without irritability.  (Tr. 403).  Ms. Stock's diagnoses remained unchanged.  (Id.).

Terry Dunn, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on November 25, 2009.  (Tr. 470-81).  Dr. Dunn expressed the opinion that plaintiff had mild limitation in his activities of daily living; mild limitation in his ability to maintain social functioning; and moderate limitation in his ability to maintain concentration, persistence, or pace.

(Tr. 478).  Dr. Dunn also completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff has moderate limitations in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.  (Tr. 482-83).  Dr. Dunn stated that plaintiff retains the capacity to understand, remember, and complete routine, simple, repetitive work tasks in a competitive work environment.  (Tr. 483).  Dr. Dunn also recommended that plaintiff have limited social contact in a work setting to reduce stress.  (Id.).

Plaintiff presented to Ms. Stock on January 22, 2010, at which time plaintiff reported that he had been more depressed with the holidays.  (Tr. 508).  Plaintiff also complained of poor sleep and some irritability.  (Id.).  Ms. Stock's diagnoses remained unchanged.  (Id.).

On March 4, 2010, plaintiff presented to Jhansi Vasireddy, M.D. at Comtrea, with complaints of depression and anxiety.  (Tr. 506).  Plaintiff reported that he did not like to be around people and the anxiety gets worse when he is in public places.  (Id.).  Plaintiff reported that he was not having any psychotic symptoms and did not want to take Abilify due to the side effects.  (Id.).  Dr. Vasireddy diagnosed plaintiff with bipolar mood disorder, type II, depressive phase; anxiety disorder, not otherwise specified; and personality disorder, not otherwise specified, with dependent traits.  (Id.).  Dr. Vasireddy increased plaintiff's dosage of Cymbalta, and discontinued the Abilify.  (Tr. 507).

- 14 -

On April 29, 2010, plaintiff presented to Dr. Vasireddy, at which time he reported that he had been feeling more depressed due to relationship problems.  (Tr. 504).  Upon mental status examination, plaintiff had normal psychomotor activity, depressed mood, mildly constricted affect, goal-directed thought process, and fair insight and judgment.  (Id.).  Dr. Vasireddy diagnosed plaintiff with bipolar mood disorder, type II, depressive phase; anxiety disorder, not otherwise specified; and personality disorder, not otherwise specified, with dependent traits; and assessed a GAF score of 55 to 60.[17]  (Id.).

Plaintiff was taken to the emergency room at Jefferson Regional Medical Center on June 23, 2010, after reporting to his girlfriend that he would be better off dead.  (Tr. 529).  Plaintiff indicated that he wanted to get his brother's gun.  (Tr. 532).  Plaintiff's girlfriend had called the police and EMS transported him to the hospital.  (Id.).  Plaintiff denied wanting to hurt himself at that time.  (Id.).  Plaintiff had been noncompliant with Cymbalta for one to two weeks.  (Id.).  Upon mental status examination, Ahmad B. Ardekania, M.D. noted that plaintiff was suicidal, homicidal, and hostile.  (Id.).  Plaintiff's mood changed rapidly in the emergency room.  (Id.).  Plaintiff's insight and judgment were impaired.  (Tr. 533).  Dr. Ardekania diagnosed plaintiff with bipolar affective disorder, mixed; panic/anxiety; and a GAF score of 30.[18]  (Id.).  Plaintiff's medications were adjusted.  (Id.).  Plaintiff's condition was stabilized on medication, and plaintiff

---

[17]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[18]A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  DSM-IV at 32.

was discharged on June 29, 2010.  (Tr. 537).

Mr. Cummings completed a Physical Residual Functional Capacity Questionnaire on June 30, 2010, in which he indicated that plaintiff had been diagnosed with bipolar disorder, hypothyroidism, and osteoarthritis.  (Tr. 545).  Mr. Cummings described plaintiff's symptoms as unstable moods, crying to agitated.  (Id.).  Mr. Cummings found that plaintiff was incapable of even "low stress" jobs.  (Tr. 546).  Mr. Cummings stated that plaintiff's major limitations are related to his mental health, and that his psychiatrist could better address these issues, but noted that he had witnessed multiple episodes of labile mood with crying and rapid agitation.  (Tr. 549).

Plaintiff presented to Dr. Vasireddy on July 21, 2010, at which time he reported he was doing better that month.  (Tr. 560).  Plaintiff denied any paranoid delusions or hallucinations. (Id.).  Plaintiff reported that he was too anxious to work and requested a letter indicating he was unable to work.  (Id.).  Upon mental status examination, plaintiff's mood was "good," his affect was mildly constricted, his thought process was goal-directed, and his insight and judgment were fair.  (Id.).  Dr. Vasireddy diagnosed plaintiff with bipolar mood disorder, type II, depressive phase; anxiety disorder not otherwise specified; personality disorder, not otherwise specified, with dependent traits; and a GAF score of 55 to 60.  (Id.).  Plaintiff's medications were continued. (Id.).

Plaintiff presented to Michael T. Armour, Ph.D., licensed psychologist, on October 14, 2010, for a psychological evaluation.  (Tr. 565-72).  Dr. Armour administered the MMPI-2 RF, which was invalid due to plaintiff's elevated scores on three of the four "over-reporting" validity scales.  (Tr. 568).  Upon mental status examination, plaintiff's mood was anxious; and his affect was limited in terms of range in that he showed little emotional expression or variation.  (Tr. 568-

- 16 -

69).  Plaintiff reported hearing voices in the past, which he described as "background talking."

(Tr. 569).  Plaintiff reported difficulty sleeping, anxious mood, crying spells, and anxiety in public

places.  (Id.).  Plaintiff's intellect was found to be within the low average range of intellectual

functioning.  (Id.).  Plaintiff's long-term memory was grossly intact, and his insight and judgment

were assessed as adequate for his safety.  (Id.).  Dr. Armour diagnosed plaintiff with bipolar II

disorder, depressive type; anxiety disorder NOS; alcohol abuse by history; and cannabis abuse by

history; and assessed a GAF score of 45.  (Tr. 569-70).  With regard to plaintiff's functional

limitations, Dr. Armour found that plaintiff has moderate impairment in activities of daily living;

moderate to at times severe impairment in social functioning; moderate impairment in

concentration, persistence or pace; and repeated episodes of deterioration in a work-like setting.

(Tr. 570).  Dr. Armour expressed the opinion that plaintiff has moderate impairment in his ability

to understand and remember instruction; moderate impairment in his ability to sustain

concentration and persistence in tasks; and moderate and at times severe impairment in his ability

to interact socially and adapt to his environment.  (Tr. 570-71).  Dr. Armour also completed a

Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he found

that plaintiff had marked limitation in his ability to interact appropriately with the public, and

respond appropriately to usual work situations and to changes in a routine work setting.  (Tr.

575).  Dr. Armour found that plaintiff had moderate limitations in his ability to understand and

remember complex instructions; carry out complex instructions; make judgments on complex

work-related decisions; interact appropriately with supervisors; and interact appropriately with

co-workers.  (Tr. 574-75).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act on
        March 29, 2008, and he remained insured throughout the period of this decision
        (Exhibit B4D).

2.      The claimant has not engaged in substantial gainful activity since March 29, 2008,
        (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: a bipolar disorder, an anxiety
        not otherwise specified, and a history of marijuana and alcohol abuse (20 CFR
        404.1520(c) and 416.920(c)).

4.      The claimant's condition has not met or medically equaled a listing in 20 CFR
        Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
        416.920(d), 416.925 and 416.926).

5.      Since March 29, 2008, the claimant has had the residual functional capacity to
        understand, remember, and carry out at least simple instructions and non-detailed
        tasks, sustain concentration and attention for two hour segments over an eight-
        hour period, respond appropriately to supervisors in a task-oriented setting where
        contact with co-workers and others is casual and infrequent and perform repetitive
        work according to set procedures, sequence, or pace.  He has not had any
        exertional limitations.  This constitutes a wide range of unskilled work.

6.      The claimant has been unable to perform his past relevant work (20 CFR
        404.1565 and 416.965).

7.      The claimant was forty-eight years old on March 29, 2008, and is now fifty-one
        years old (in regulatory parlance, a younger individual, now person closely
        approaching advanced age) (20 CFR 404.1563 and 416.963).

8.      The claimant has a high school education (20 CFR 404.1564 and 416.964).

9.      The claimant does not have any transferable skills (20 CFR 404.1568
        and 416.968).

10.     A significant number of jobs have existed for the claimant in the national
        economy since March 29, 2008 (20 CFR 404.1560(c), 404.1566, 416.960(c), and
        416.966).

11.     The claimant has not been disabled within the meaning of the Social Security Act

- 18 -

(20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-16).

The ALJ's final decision reads as follows:

> The claimant's applications for a period of disability, disability insurance benefits and supplemental security income, protectively filed on September 8, 2009, are denied. The claimant has not been disabled under sections 216(I), 223(d) or 1614(a)(3)(A) of the Social Security Act.

(Tr. 16).

**Discussion**

**A.**     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work:

- 21 -

activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities.  See id.  Next, the Commissioner must determine the severity of the impairment

based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**   **Plaintiff's Claims**

     Plaintiff argues that the ALJ erred in determining plaintiff's RFC.  Plaintiff also contends

that the hypothetical question posed to the vocational expert was erroneous.  The undersigned

will discuss plaintiff's claims in turn.

     A disability claimant's RFC is the most he or she can still do despite his or her limitations.

20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (abrogated

on other grounds), the Eighth Circuit defined RFC as the ability to do the requisite work-related

acts "day in and day out, in the sometimes competitive and stressful conditions in which real

people work in the real world."  Id. at 1147.  The ALJ's determination of an individual's RFC

should be "based on all the evidence in the record, including 'the medical records, observations of

treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier

v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)."  Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

The ALJ made the following determination regarding plaintiff's RFC:

Since March 29, 2008, the claimant has had the residual functional capacity to understand, remember, and carry out at least simple instructions and non-detailed tasks, sustain concentration and attention for two hour segments over an eight-hour period, respond appropriately to supervisors in a task-oriented setting where contact with co-workers and others is casual and infrequent and perform repetitive work according to set procedures, sequence, or pace.  He has not had any exertional limitations.  This constitutes a wide range of unskilled work.

(Tr. 13).

Plaintiff contends that the ALJ erred in relying on the opinion of a non-examining psychologist in determining plaintiff's RFC.  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir.

2002) (internal quotation marks and citation omitted).  When considering professionals' opinions, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." Ellis v. Barnhard, 392 F.3d 988, 995 (8th Cir. 2005) (internal citation omitted).  A treating physician's opinion regarding a claimant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, it does "not automatically control, since the record must be evaluated as a whole." Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).  "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (internal quotation marks and citation omitted).

The ALJ noted that state agency psychologist Dr. Dunn reviewed the record in November 2009, and expressed the opinion that plaintiff retained the ability to understand, remember, and complete routine, simple, repetitive work tasks in a competitive environment where social contact is limited.  (Tr. 13, 483).  The ALJ stated that Dr. Dunn's opinion is "persuasive because it is consistent with the record as a whole."  (Tr. 13).

The ALJ summarized the medical record, noting that mental status evaluations conducted at Comtrea did not "demonstrate any deficits or abnormalities other than a negative thought pattern, a depressed mood, a blunt affect-usually a slightly blunt affect, irritability, decreased psychomotor activity, and anxiety."  (Id.).  The ALJ stated that plaintiff regularly exhibited a

negative thought pattern, depressed mood, and blunt affect, but irritability and decreased

psychomotor activity were only occasionally exhibited, while anxiety was rarely exhibited.  (Id.).

The ALJ noted that Dr. Vasireddy, a Comtrea psychiatrist, assessed a GAF score of 55 to 60 in

July 2010.  (Tr. 14).  The ALJ pointed out that plaintiff's two psychiatric hospitalizations due to

suicidal ideation occurred when plaintiff was non-compliant with psychotropic medication.  (Id.).

The undersigned finds that the ALJ erred in relying on the opinion of a non-examining

state agency physician.  A non-examining consultant's opinion alone is insufficient to support an

ALJ's RFC determination, and certainly falls short when contradicted by the opinion of a treating

physician.  See Jenkins v. Apfel, 196 F.3d 922, 924-25 (8th Cir. 1999).  In this case, the medical

evidence from examining mental health providers supports greater limitations than those found by

the state agency psychologist.

The record reveals that plaintiff received regular mental health treatment at Comtrea.

Plaintiff was most often seen by Ms. Stock, an Adult Psychiatric/Mental Health Clinic Nurse

Specialist, for medication management and supportive psychotherapy.  Plaintiff regularly reported

symptoms of depression, anxiety, mood swings, anger, crying spells, irritability, verbal lashing

out, hearing voices, and seeing shadows.  (Tr. 431, 429, 425, 423, 419, 417, 415, 410, 405, 508).

Ms. Stock first diagnosed plaintiff with major depression, recurrent; probable bipolar affective

disorder with question of psychosis; and personality disorder NOS.  (Tr. 431, 429).  In July 2008,

Ms. Stock changed her diagnoses to bipolar affective disorder with psychotic features, and

personality disorder NOS.  (Tr. 425).  In October 2008, Ms. Stock's diagnoses were bipolar

affective disorder II with psychotic features, and personality disorder NOS with passive

dependent traits.  (Tr. 419).  Ms. Stock consistently assessed GAF scores of 40 to 50.  (Tr. 431,

- 25 -

429, 425, 423, 421, 419, 417, 415, 413, 412, 410, 408, 407, 405, 403, 508).  As the ALJ noted, Dr. Vasireddy assessed a GAF score of 55 to 60 in July 2010.  (Tr. 14, 560).  Mental status examinations often revealed evidence of anxiety, depression, and irritability, and occasionally revealed evidence of psychosis, including hearing voices and seeing shadows.  Plaintiff was prescribed multiple psychotropic medications, including antipsychotic drugs, that were regularly adjusted by psychiatrists at Comtrea.  While the evidence reveals that plaintiff was hospitalized for suicidal thoughts only when he was not fully compliant with his medications, the treatment notes from Comtrea demonstrate that plaintiff experienced significant symptoms even when he was compliant with his medications.

The ALJ acknowledged that Ms. Stock repeatedly assessed plaintiff's global functioning as seriously impaired.  (Tr. 14).  The ALJ indicated that he was disregarding this evidence because a nurse is not an acceptable medical source for establishing the severity of an impairment.  (Id.). The ALJ stated that, even if Ms. Stock's lack of credentials were overlooked, her opinions would be given slight weight because they are not supported by the mental status evaluation results obtained at Comtrea.  (Id.).

The undersigned finds that the ALJ erred in disregarding Ms. Stock's GAF scores.  Ms. Stock's treatment notes are considered "other medical evidence."  20 C.F.R. § 404.1513(d)(1).  A nurse is not an acceptable medical source whose evidence can establish an impairment.  See 20 C.F.R. §§ 404.1513(a), 416.913(a).  However, evidence from a nurse may be considered as "other medical evidence" when assessing the severity of an impairment.  See 20 C.F.R. §§ 404.1513(d)(1), 416.923(d)(1).  In determining what weight to give "other medical evidence," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.

20 C.F.R. § 404.1527(d)(4); Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (explaining that therapist's assessment is to be treated as "other medical evidence" rather than as a treating source opinion).

Even though Ms. Stock's opinions were not entitled to treating source weight, her opinions were entitled to consideration as other medical evidence in the record. See Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006). Despite the ALJ's finding to the contrary, Ms. Stock's GAF scores are supported by the significant symptoms she noted on mental status examination, including psychotic symptoms.

The ALJ also indicated that he was assigning "virtually no weight" to the opinions of Dr. Armour due to Dr. Armour's finding that plaintiff's personality test results were invalid due to evidence of exaggeration. (Tr. 14).

As the ALJ points out, Dr. Armour administered the MMPI-2RF, which he found was invalid due to plaintiff's elevated sores on three of the four "over-reporting" validity scales. (Tr. 568). Upon mental status examination, plaintiff's mood was anxious; and his affect was limited in terms of range. (Tr. 568-69). Plaintiff reported hearing voices in the past. (Tr. 569). Plaintiff reported difficulty sleeping, anxious mood, crying spells, and anxiety in public places. (Id.). Dr. Armour estimated plaintiff's intellect as within the low average range of intellectual functioning. (Id.). Dr. Armour diagnosed plaintiff with bipolar II disorder, depressive type; anxiety disorder NOS; alcohol abuse by history; and cannabis abuse by history; and assessed a GAF score of 45. (Tr. 569-70). Dr. Armour expressed the opinion that plaintiff had marked limitation in his ability to interact appropriately with the public, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 574-75). Dr. Armour also found that plaintiff had moderate limitation in many areas. (Id.).

As previously noted, the ALJ discredited Dr. Armour's opinions due to the evidence of over-reporting in his personality testing. While plaintiff's personality tests may have been invalid, Dr. Armour nonetheless found that plaintiff suffered from significant psychiatric symptomatology. This finding is supported by Dr. Armour's report. Upon mental status examination, Dr. Armour noted that plaintiff was anxious and his affect was limited. (Tr. 568-69). As support for his finding that plaintiff had moderate to severe limitations in his ability to maintain social functioning, the ALJ stated that plaintiff "presented as more anxious and agitated in this evaluation." (Tr. 570). Dr. Armour's opinions were also based on his review of plaintiff's records, and plaintiff's reported symptoms. Significantly, Dr. Armour's diagnoses and GAF score were consistent with those of plaintiff's Comtrea providers. Further, Dr. Armour was the only examining mental health provider to express an opinion regarding plaintiff's limitations. Thus, the ALJ erred in assigning "virtually no weight" to Dr. Armour's opinion.

In sum, the ALJ erred in relying on the opinion of the non-examining state agency psychologist. The treatment notes from mental health providers at Comtrea, as well as the examining psychologist Dr. Armour, reveal greater limitations than those found by the state agency psychologist. Thus, the ALJ's RFC determination is not supported by substantial evidence.

The hypothetical question posed to the ALJ was based on this erroneous RFC. As such, the vocational expert's response does not constitute substantial evidence supporting the Commissioner's denial of benefits.

## Conclusion

The ALJ erred in relying on the opinion of a non-examining state agency psychologist in determining plaintiff's RFC when the evidence of record supports the presence of greater

- 28 -

limitations.  For this reason, this cause will be reversed and remanded to the ALJ in order for the

ALJ to evaluate the medical opinions under the proper standards, develop any additional facts as

needed, assess a residual functional capacity consistent with the medical and other evidence, and

obtain vocational expert testimony to determine whether plaintiff is capable of performing work in

the national economy with his limitations.  Accordingly, a Judgment of Reversal and Remand will

be entered separately in favor of plaintiff in accordance with this Memorandum.


Dated this 27th  day of March, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE